**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CRITERION CLAIM SOLUTIONS, INC., et al.,

Plaintiffs,

v.

SCOTTSDALE INDEMNITY COMPANY, et al.,

Defendants.

Civil Action No. 20-6225 (MAS) (ZNQ)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Scottsdale Indemnity Company ("Scottsdale") and Capitol Specialty Insurance Corporation's ("Capitol") (collectively, "Defendants") Motions to Dismiss Plaintiffs Criterion Claim Solutions, Inc. ("Criterion") and Thomas Mulligan's ("Mulligan") (collectively, "Plaintiffs") Complaint. (ECF Nos. 17, 27.) Plaintiffs opposed Scottsdale's Motion and filed a Cross-Motion for Partial Summary Judgment. (ECF No. 33.) Scottsdale replied and opposed. (ECF No. 41.) Plaintiffs also opposed Capitol's Motion (ECF No. 34), and Capitol replied (ECF No. 40). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Defendants' Motions to Dismiss are granted and Plaintiffs' Cross-Motion for Partial Summary Judgment is denied.

# I. BACKGROUND

Criterion is a claims management company organized under the laws of, and maintains its principal place of business, in Nebraska. (Compl. ¶ 11, ECF No. 1.) Mulligan is a New Jersey resident and Criterion's sole member and Chief Executive Officer. (*Id.* ¶ 12.) Scottsdale is an insurance company organized under the laws of Ohio and maintains its principal place of business in Arizona. (*Id.* ¶ 13.) Capitol is an insurance company organized under the laws of Wisconsin and maintains its principal place of business in Arizona. (*Id.* ¶ 14.)

Criterion previously served as a third-party administrator for Spirit Commercial Auto Risk Retention Group, Inc. ("Spirit"), and performed claims management services under an agreement in which Criterion had professional liability insurance. (Nevada Compl. ¶¶ 8, 14, Ex. A to Scottsdale's Moving Br., ECF No. 17-3.)[1] "Spirit was an association captive insurance company" that "transacted commercial auto liability insurance business and specialized in serving commercial truck owners." (*Id.* ¶¶ 6, 8.)

In 2019, Criterion purchased a multi-layered insurance policy program with a $10,000,000 coverage limit for the policy period March 2019 to March 2020. (Compl. ¶¶ 18–20.) Scottsdale issued the primary policy with a $5,000,000 limit of liability ("Scottsdale Policy"), and Capitol issued the excess policy with a $5,000,000 limit of liability ("Capitol Policy"). (*Id.* ¶¶ 19–20.)

---

[1] Although generally "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings," a "document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (alteration in original) (citations omitted). Similarly, when resolving "a 12(b)(6) motion, a court may properly look at public records including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp.*, 181 F.3d 410, 426 (3d Cir. 1999).

### A. Scottsdale Policy

The Scottsdale Policy provides coverage under a Miscellaneous Professional Services Coverage Section ("MPS Coverage Section"). (*See* Scottsdale Policy *10–17,[2] Ex. 1 to Compl., ECF No. 1-2.) Criterion and Mulligan qualify as Insureds under the MPS Coverage Section. (Compl. ¶ 21; Scottsdale Policy *11, § B(5).) The MPS Coverage Section provides that Scottsdale "shall pay on behalf of the **Insureds**, **Loss** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against any Insureds . . . for a **Wrongful Act**[.]"[3] (Compl. ¶ 22; Scottsdale Policy *10, § A(1) (emphasis in original).)

Under the policy, it is "the right and duty of [Scottsdale] and not [Criterion or Mulligan] to defend any **Claim**." (Scottsdale Policy *16, § F(1) (emphasis in original).) The MPS Coverage Section also contains a provision that, as amended, excludes from coverage any claim:

> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the insolvency, receivership, bankruptcy, liquidation or financial inability to pay of any **Insured**, or any insurer, self-insurer trust, insurance plan or other vehicle or instrumentality which provides services [(the "Insolvency Exclusion")].

(Scottsdale Policy *14, § C(14), as amended by *26–27, § C(14).)

### B. Capitol Policy

The Capitol Policy "follows form" to the Scottsdale Policy and provides that Capitol will provide coverage in excess of the underlying limits. (Compl. ¶ 3; Capitol Policy *3, *5 § I(A), Ex.

---

[2] Page numbers preceded by an asterisk refer to the page number on the ECF header.

[3] The MPS Coverage Section defines wrongful act as "any actual or alleged error, omission, misleading statement, misstatement, neglect, libel, slander or other defamatory or disparaging material, breach of duty or act allegedly committed or attempted by the **Insureds**, which occurs solely in connection with the **Insureds** rendering of, or actual or alleged failure to render, **Professional Services**." (Scottsdale Policy *12, § B(11) (emphasis in original).)

2 to Compl., ECF No. 1-3.) The Capitol Policy contains an exhaustion clause which provides that the policy "will only apply after all **Underlying Insurance Polices** . . . have actually paid the full amount of the Underlying Limit of Liability[.]" (Capitol Policy *6, § IV(C) (emphasis in original).) In addition, the Capitol Policy states its obligations "will not be increased, expanded or otherwise changed as a result of . . . [a]ny positions taken by the **Underlying Insurers** with respect to coverage . . . or the inability or refusal to pay by any of the **Underlying Insurers**[.]" (*Id.* at *6, § V(F)(2) (emphasis in original).)

As to a duty to defend, the Capitol Policy states: "the limit of liability will be reduced and may be exhausted by the payment of defense expenses. The issuing company does not assume any duty to defend." (*Id.* at *3.) Under the Limit of Liability/Exhaustion of Underlying Insurance section, the policy states the $5,000,000 limit of liability "is the most [Capitol] will pay for all amounts (including defense expenses) from all **Claims**[.]" (*Id.* at *6, § IV(A) (emphasis in original).) The section also repeats that "[p]ayment of defense expenses . . . will reduce and may exhaust the [l]imit of [l]iability." (*Id.* at *6, § IV(B).) Under the Coverages section, the policy contains a subsection titled "NO DUTY TO DEFEND" that states Capitol "does not assume any duty to defend." (*Id.* at *5, § I(B).)

Plaintiffs allege that Defendants have improperly denied coverage under the policies in connection with two actions: the Kentucky Suit and the Nevada Suit (the "Underlying Actions").

### C. Underlying Actions

#### 1. Kentucky Suit

The Kentucky Suit was filed by George Gillett ("Gillett"). (Compl. ¶ 31.) According to the Kentucky Suit, in March 2017, Gillett's vehicle was struck by a truck owned by Sarman Trucking,

LLC ("Sarman"). (Kentucky Compl. ¶ 12, Ex. B to Scottsdale's Moving Br., ECF No. 17-4.)[4] Following the accident, Gillett filed a different lawsuit against Sarman in which Gillett obtained a $750,000 judgment in January 2019. (*Id.* ¶¶ 29, 35.) Gillett, however, was not able to collect the judgment from Sarman because Sarman had dissolved. (*Id.* ¶¶ 36–37.) At the time of the accident, Sarman was insured by Spirit and Criterion served as Spirit's third-party administrator. (*Id.* ¶¶ 38, 92.) Spirit and Criterion allegedly mishandled the compensation owed to Gillett. (*See id.* ¶¶ 38–39.) Gillett ultimately filed a lawsuit against Spirit seeking to collect the judgment. (*See id.* ¶ 48.) Thereafter, on February 27, 2019, Spirit was placed into receivership due to financial difficulties and was subsequently placed into liquidation on November 6, 2019. (Nevada Compl. ¶ 9.)

On December 31, 2019, Gillett filed the Kentucky Suit against Criterion and Mulligan, among others, in the Jefferson Circuit Court, Jefferson County, Kentucky. (*See generally* Kentucky Compl.) Gillett alleges that "Criterion received money that should have been retained by or paid to Spirit (and/or claimants or beneficiaries of insurance policies issued by Spirit)." (*Id.* ¶ 93.) Gillett also alleges Criterion and the other defendants "had a relationship with Spirit such that they are mere alter egos of one another[.]" (*Id.* ¶ 104.) Alternatively, Gillett alleges Criterion and the other defendants "undercapitalized Spirit, or otherwise knew or should have known that Spirit was undercapitalized and still issuing policies[.]" (*Id.* ¶ 107.) In addition, Gillett alleges that Criterion and the other defendants "knew of the impending insolvency and did what they could to

---

[4] Although generally "a district court ruling on a motion to dismiss may not consider matters extraneous to pleadings," a "document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (alteration in original) (citations omitted). Similarly, when resolving "a 12(b)(6) motion, a court may properly look at public records including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp.*, 181 F.3d 410, 426 (3d Cir. 1999).

delay the insolvency so that they could continue to make more money" by, for example, making "material misstatements in financial documents[.]" (*Id.* ¶¶ 114–15.) Gillett asserted three causes of action against Criterion and Mulligan: (1) civil conspiracy, (2), conversion, and (3) declaratory judgment. (*Id.* ¶¶ 140, 143, 145.)

"Shortly after receiving notice of the Kentucky Suit, [Plaintiffs] tendered their claim to the Defendants for coverage." (Compl. ¶ 41.) Plaintiffs assert that coverage applies because the allegations set forth in the Kentucky Suit involve wrongful acts as defined in the policy. (*Id.* ¶ 36.) By letter dated February 11, 2020, Scottsdale denied coverage based on the Insolvency Exclusion. (*Id.* ¶¶ 42, 46.)

**2. Nevada Suit**

In February 2020, Barbara D. Richardson, in her capacity as the statutory receiver for Spirit, filed a lawsuit against Criterion and Mulligan, among others, in the Eighth Judicial District Court of the State of Nevada, Clark County (the "Nevada Suit"). (*Id.* ¶ 37; *see generally* Nevada Compl.) The complaint asserts that the lawsuit "arises out of a vast fraudulent enterprise orchestrated by . . . Mulligan[.]" (Nevada Compl. ¶ 1.) The complaint alleges that Mulligan "was a manager, officer or director of Spirit." (*Id.* ¶ 10.) The "complaint seeks to recover, on behalf of Spirit and those affected, the tens of millions of dollars that are owed to Spirit from its principal Mulligan and his cohorts[.]" (*Id.* ¶ 4.)

The complaint asserts the following causes of action against Criterion and Mulligan: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violations of the Nevada Racketeer Influenced and Corruption Act; (4) unjust enrichment; (5) fraud; and (6) civil conspiracy. (*Id.* ¶¶ 274–79, 320–79.)

"Shortly after receiving notice of the Nevada Suit, [Plaintiffs again] tendered their claim to the Defendants for coverage." (Compl. ¶ 53.) As with the Kentucky Suit, Plaintiffs asserted that coverage applied because the allegations set forth in the Nevada Suit involve wrongful acts as defined in the policy. (*Id.* ¶ 39.) Scottsdale, however, again denied Plaintiffs coverage based in part on the Insolvency Exclusion. (*See id.* ¶¶ 54, 58.)

**D. Procedural History**

On May 21, 2020, Plaintiffs filed the instant two-count action against Defendants. (*See generally id.*) Count One asserts a breach of contract claim against Scottsdale and Count Two asserts a claim for declaratory judgment against Scottsdale and Capitol. (*Id.* ¶¶ 65–80.) In July 2020, Scottsdale moved to dismiss Plaintiffs' Complaint for failure to state a claim. (ECF No. 17.) In August 2020, Capitol moved to dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction and failure to state a claim. (ECF No. 27.) In September 2020, Plaintiffs opposed Defendants' Motions and filed a Cross-Motion for Partial Summary Judgment against Scottsdale. (ECF Nos. 33, 34.) On October 23, 2020, Scottsdale replied to Plaintiffs' opposition and opposed Plaintiffs' Cross-Motion for Partial Summary Judgment. (ECF No. 39, 41.) Capitol also replied to Plaintiffs' opposition. (ECF No. 40.) On December 30, 2020, the Court entered an Order staying discovery in this matter. (ECF No. 49.) By leave granted, Plaintiffs filed a Reply Brief in further support of their Cross-Motion on February 19, 2021. (ECF No. 52.)

## II. LEGAL STANDARD

Rule 8(a)(2)[5] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and

[5] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 678). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). The "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

## III. DISCUSSION

### A. Scottsdale Policy

Scottsdale primarily argues that the Insolvency Exclusion precludes coverage for the Underlying Actions because they "arise out of and/or in some way involve the insolvency, receivership, bankruptcy, liquidation, or financial inability to pay of an insurer—Spirit." (Scottsdale's Moving Br. 13, ECF No. 17-1.)

In opposition, Plaintiffs contend that the Insolvency Exclusion is inapplicable because: (1) Spirit was a risk retention group, not an insurer; and (2) Spirit was not an entity that "provides services." (Pls.' Opp'n Br. 16–21, ECF No. 33.)

Interpreting an insurance contract is a legal question to be resolved by the Court. *Rena, Inc. v. Brien*, 708 A.2d 747, 756 (N.J. Super. Ct. App. Div. 1998). "Absent statutory [prohibitions], an insurance company has the right to impose whatever conditions it desires prior to assuming its obligations and such provisions should be construed in accordance with the language used." *Wyndham Constr., LLC v. Columbia Cas. Ins. Co.*, 208 F. Supp. 3d 599, 602 (D.N.J. 2016) (alteration in original) (quoting *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 721 (N.J. 1960)). "In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). "If the language is clear, that is the end of the inquiry." *Id.* "If the plain language of the policy is unambiguous," the Court should "not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (N.J. 2016) (quoting *Chubb Custom Ins. Co.*, 948 A.2d at 1289) (internal quotation marks omitted)).

A provision in an insurance policy that "is subject to more than one reasonable interpretation . . . is ambiguous." *Id.* The New Jersey Supreme Court has advised "that '[w]here the policy language [of an insurance policy] supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied.'" *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001) (alteration in original) (quoting *Lundy v. Aetna Cas. & Sur. Co.*, 458 A.2d 106, 111 (N.J. 1983)). This approach, however, is limited to

instances where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Id.* (citation omitted). "When construing an ambiguous clause in an insurance policy, courts should consider whether clearer draftsmanship by the insurer 'would have put the matter beyond reasonable question.'" *Id.* (quoting *Doto v. Russo*, 659 A.2d 1371, 1377 (N.J. 1995)). "Far-fetched interpretations of a policy exclusion are insufficient to create an ambiguity requiring coverage." *Wear v. Selective Ins. Co.*, 190 A.3d 519, 528 (N.J. Super. Ct. App. Div. 2018). "Neither the duty to defend nor the duty to indemnify 'exists except with respect to occurrences for which the policy provides coverage.'" *Id.* at 528–29 (quoting *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 483 A.2d 402, 405 (N.J. 1984)).

Under New Jersey law, "insurance policy exclusions [generally] must be narrowly construed; the burden is on the insurer to bring the case within the exclusion." *Princeton Ins. Co. v. Chunmuang*, 698 A.2d 9, 16–17 (N.J. 1997) (citation omitted). Exclusions, however, "are presumptively valid and will be given effect if specific, plain, clear, prominent, and not contrary to public policy." *Id.* at 17 (internal quotation marks and citation omitted). Moreover, "in the context of insurance contract interpretation, the phrase 'arising out of' must be interpreted in a broad and comprehensive sense to mean 'originating from' or 'growing out of' the [activity]." *U.S. Specialty Ins. Co. v. Sussex Airport, Inc.*, No. 14-5494, 2016 WL 2624912, at *3 (D.N.J. May 9, 2016) (alteration in original) (citation omitted). "[T]here need be shown only a substantial nexus between the activity and the injury." *Id.* (internal quotation marks omitted).

Here, Plaintiffs do not dispute that the phrases "arising out of" or "in any way involving" in insurance policies are generally construed broadly. (Pls.' Opp'n Br. 21–22 ("whether 'arising out of' or 'in any way involving' is construed broadly or not is irrelevant in the context of this case, and in particular, in the context of this insolvency exclusion.") (emphasis omitted).) Instead,

Plaintiffs point to two Third Circuit cases to support their proposition that the Insolvency Exclusion is inapplicable because risk retention groups are not insurers. (*Id.* at 19 (citing *Onyx Ins. Co. v. N.J. Dep't of Banking & Ins. Div.*, 704 F. App'x 110, 114 (3d Cir. 2017); *Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787 (3d Cir. 2009)).) Plaintiffs assert that the *Oynx* court "explained" that "*Congress expressly intended risk retention groups to be treated differently from other insurers in manifold situations*[.]" (*Id.* (citing *Onyx*, 704 F. App'x at 114) (alteration in original).) According to Plaintiffs, "[t]his is exactly one of those manifold situations, particularly since the interpretation of an exclusion is at issue." (*Id.*) As to *Millennium*, Plaintiffs posit the court went on to "*hold[] risk retention groups 'are not insurers.'*" (*Id.* (citing *Millennium*, 332 F. App'x at 789).) The Court disagrees.

*Onyx* involved a risk retention group that provided liability insurance to taxis in New Jersey. 704 F. App'x at 112. In that case, the court rejected Onyx's argument that the LRRA[6] required the State to allow Onyx to participate in a State-created fund with a risk-sharing mechanism that was administered by a State insurance guaranty association. *Id.* at 113. The court found that "the LRRA merely gives states the option to do so—an option that New Jersey ha[d] declined to exercise." *Id.* The court also noted that "New Jersey's dissimilar treatment of risk retention groups and other insurers represents the 'trade-off' for risk retention groups: '[I]n exchange for limited State regulation,' risk retention groups are not permitted membership in insolvency guaranty associations, such as the [a]ssociation here." *Id.* at 113–14 (first alteration in original) (citation omitted) (first alteration in original). In that context, the court stated that "Congress expressly intended risk retention groups to be treated differently from other insurers in manifold situations, as exemplified in the LRRA's statutory exemptions for risk retention groups

[6] Liability Risk Retention Act ("LRRA"), 15 U.S.C. § 3902(a)(2).

from "State law[s], rule[s], regulation[s], or order[s]." *Id.* at 114 (alterations in original) (citing 15 U.S.C. § 3902(a)) (alternations in original).

And in *Millennium*, the Third Circuit found that out-of-state risk retention groups were not subject to a New Jersey state law which required insurers to either post a bond or produce a New Jersey certificate of authority in order to file a pleading. 332 F. App'x at 789. The court noted that the out-of-state risk retention groups were not "'insurers' within the meaning of this statute" and explained that the "LRRA protects the existence and availability of [risk retention groups] through the preemption of state regulation." *Id.*; *see* 15 U.S.C. § 3902(a) ("[A] risk retention group is exempt from any State law, rule, regulation, or order to the extent that" it would "regulate, directly or indirectly, the operation of a risk retention group except that the jurisdiction in which it is chartered may regulate the formation and operation of such a group[.]").

Thus, contrary to Plaintiffs' contention, the Third Circuit has not concluded that risk retention groups are not insurers. The Court is also unpersuaded by Plaintiffs' suggestion that the modifier "which provides services" in the Insolvency Exclusion modifies every term in the exclusion, including insurer, rather than just "other vehicle or instrumentality." (*See* Pls.' Opp'n Br. 16–17.) In other words, as written, the phrase "which provides services" only modifies the immediately preceding catch-all phrase "other vehicle or instrumentality." (*See* Scottsdale Policy *12, § C(14), as amended by *26–27, § C(14).) But even if the phrase "which provides services" did modify the term insurer, the Complaint itself indicates that Spirit issued commercial auto insurance policies. (Compl. ¶ 35.) On these facts, the Court finds that Plaintiffs are subject to the Insolvency Exclusion.

"The duty to defend is triggered by the filing of a complaint alleging a covered claim." *Abouzaid v. Mansard Gardens Assocs., LLC*, 23 A.3d 338, 346 (N.J. 2011). "As a practical

matter, the determination of an insurer's duty to defend requires review of the complaint with liberality to ascertain whether the insurer will be obligated to indemnify the insured 'if the allegations are sustained.'" *Id.* (quoting *Danek v. Hommer*, 100 A.2d 198, 203 (N.J. Super. Ct. App. Div. 1953)). "[T]he complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment, and in reaching a conclusion, doubts should be resolved in favor of the insured." *Danek*, 100 A.2d at 203.

Here, the complaints filed in the Underlying Actions indicate that the allegations set forth therein arise out of or in some way involve Spirit's insolvency. Aside from arguing that the Insolvency Exclusion is inapplicable because Spirit is neither an insurer nor service provider, Plaintiffs do not seem to dispute that the Nevada Suit arises out of Spirit's insolvency. To the extent that it does, Plaintiffs' argument fails. The Nevada Suit alleges that "[a]s a result of [a] scheme" perpetrated by Plaintiffs, Spirit "became financially insolvent and was placed into permanent receivership and subsequently into liquidation[.]" (Nevada Compl. ¶ 4.) Thus, the Nevada Suit is excluded from coverage under the Scottsdale Policy because it arises out of or in some way involves Spirit's insolvency.

As to the Kentucky Suit, the complaint in that case indicates Gillett obtained a judgment that was ultimately mishandled by Spirit and its third-party administrator, Criterion. (*See* Kentucky Compl. ¶¶ 38–39.) Gillett then filed a lawsuit against Spirit seeking to collect the judgment. (*Id.* ¶ 48.) Spirit, however, was thereafter placed into receivership and subsequently placed into liquidation. (Nevada Compl. ¶ 4) Consequently, Gillett filed the Kentucky Suit against Criterion and Mulligan, among other defendants. (*See generally* Kentucky Compl.) Gillett alleges, among other things, that Criterion "received money that should have been retained by or paid to Spirit

(and/or claimants or beneficiaries of insurance policies issued by Spirit)." (*Id.* ¶ 93.) Gillett also alleges that Criterion and the other defendants' unlawful conduct caused Spirit's insolvency. (*See id.* ¶ 139 ("it was unlawful to operate Spirit in the fashion it was operated while knowing that Spirit would ultimately become insolvent, and the Conspiring Defendants did it anyway").) Based on Criterion and the other defendants' conduct, Gillette seeks to hold Criterion liable for the judgment it sought to obtain from Sarman and Spirit. (*Id.* ¶ 144.) In light of the foregoing, Gillett's conspiracy claim and conversion in some way involve Spirit's insolvency. Had Spirit not gone into receivership, Gillett may have obtained the judgment that it was entitled to from Spirit. Thus, the Court finds that the Kentucky Suit is also excluded from coverage under the Scottsdale Policy. The Court, accordingly, grants Scottsdale's Motion to Dismiss and denies Plaintiffs' Cross-Motion for Partial Summary Judgment.

**B. Capitol Policy**

As a threshold matter, Capitol argues that this Court lacks subject-matter jurisdiction over Plaintiffs' claim for declaratory judgment. According to the Complaint, Capitol has "refused to honor [its] contractual obligations and defend [Plaintiffs] in connection with the Underlying Actions and have caused [Plaintiffs] economic harm." (Compl. ¶ 73.) According to the Complaint, Plaintiffs "are entitled to a judicial determination regarding the rights and obligations of the parties under the insurance policies. Specifically, [Plaintiffs] are entitled to a declaration that the insurance policies cover the claims filed in the Underlying Actions." (*Id.* ¶ 78.) The Complaint also asserts that "[r]esolution of this controversy will establish [Plaintiffs'] rights under the insurance policies—namely, that the Defendants must defend and indemnify [Plaintiffs] in the Underlying Actions." (*Id.* ¶ 79.)

Capitol challenges the Court's subject matter jurisdiction on ripeness grounds. (Capitol's Moving Br. 1, ECF No. 27-1 ("Plaintiffs' declaratory judgment claim against [Capitol] is not ripe, and the Court should dismiss it under Rule 12(b)(1)")); *see also Hartford Ins. Co. of the Midwest v. Dana Transp. Inc.*, No. 16-9091, 2018 WL 10152321, at *3 (D.N.J. May 21, 2018) ("Courts have considered a challenge to the ripeness of a claim to be a facial challenge to subject matter jurisdiction." (citations omitted)). First, Capitol challenges the ripeness of this dispute because "there is no actual controversy about the duty to defend because the [Capitol Policy] explicitly states that [Capitol] will never have a duty to defend Plaintiffs." (Capitol's Moving Br. 10.) Second, with regard to the duty to indemnify, Capitol argues that "there is no actual controversy about the duty to indemnify because no adverse judgment has been entered or settlement reached in the Underlying Actions sufficient to trigger an indemnity obligation." (*Id.* at 11.)

The Court finds that the dispute between the parties is ripe for adjudication. The Third Circuit has held that "'declaratory suits to determine the scope of insurance coverage brought independently of the underlying claims'—even those brought before the conclusion of an underlying action—are ripe for adjudication." *Navigators Specialty Ins. Co. v. Scarinci & Hollenbeck, LLC*, No. 09-4317, 2010 WL 1931239, at *4 (D.N.J. May 12, 2010) (quoting *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 822–23 (3d Cir. 1981). Indeed "[t]he respective interests and obligations of insured and insurers, when disputed, require determination much in advance of judgment since they will designate the bearer of ultimate liability in the underlying cases and hence the bearer of the onus and risks of settlement." *ACandS, Inc.*, 666 F.2d at 823. "So viewed, the controversy is then quite proper for a judicial determination now." *Id.* The Court, therefore, has subject-matter jurisdiction over Plaintiffs' declaratory judgment claim.

Nevertheless, the Court agrees with Capitol that Plaintiffs' claim for a declaratory judgment requiring the insurer to defend and indemnify Plaintiffs in the Underlying Actions must fail as a matter of law. The Capitol Policy repeatedly provides that Capitol does not assume any duty to defend. (Capitol Policy *3, 5, 6.) Against these repeated disclaimers, Plaintiffs cite other language in the Capitol Policy stating "the limit of liability will be reduced and may be exhausted by the payment of defense expenses." (*Id.* at *3.) But this term is only triggered "by the payment of defense expenses"—payments that Capitol has plainly disclaimed and is not required to make because it does not assume any duty to defend.

With respect to the duty to indemnify, as Capitol notes, the "Limit of Liability applicable to this [Capitol Policy] will only apply after all Underlying Insurance Policies . . . have actually paid the full amount of the Underlying Limit of Liability[.]" (*Id.* at *6 (emphasis in original).) Here, there is no dispute that the underlying insurance policy issued by Scottsdale has not been paid in full. And for the above-stated reasons, Scottsdale has no obligation to pay the full amount of the underlying limit of liability. Plaintiff, therefore, is not entitled to a declaratory judgment that Capitol must indemnify it for the Underlying Actions. The Court, accordingly, grants Capitol's Motion to Dismiss Count Two.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted and Plaintiffs' Cross-Motion for Partial Summary Judgment is denied. The Court will enter an Order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE